UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:24 C 174 |
| | ) |
| CHARLES TRUITT; KENNETH OSBORNE; | ) Judge Rebecca R. Pallmeyer |
| CHARLOTTE ABELITA; HELEN | ) |
| BRUCKNER; and WEXFORD HEALTH | ) |
| SOURCES, INC., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In December of 2022, Plaintiff Michael Thomas—who was then incarcerated in Stateville Correctional Center, an Illinois Department of Corrections facility—woke up with burning pain in his right ear and reduced hearing. He sought out medical care, and medical staff extracted a cockroach from his ear. But Thomas continued to experience pain, and despite his complaints, staff failed for several days to provide treatment for an ear infection that Thomas believes resulted from the cockroach. In this lawsuit, Thomas brings various 42 U.S.C. § 1983 claims against Defendants, arguing that the conditions of his confinement violated his Eighth Amendment rights. Specifically, Thomas claims medical staff at Stateville Correctional Center denied him adequate medical treatment for the ear infection. Thomas also alleges that the unsanitary living conditions at Stateville, which he claims caused the infection, violated the Constitution's prohibition on cruel and unusual punishment. Defendants have moved for summary judgment, arguing that Thomas failed to exhaust his administrative remedies—a prerequisite, under the Prison Litigation Reform Act, to his filing suit. *See* 42 U.S.C. § 1997e(a). For the reasons outlined here, the motions are denied.

**BACKGROUND**

For the purposes of summary judgment, the court's account presents the facts in the light most favorable to Thomas, the non-moving party, and draws all reasonable inferences in his favor. See Bell v. Taylor, 827 F.3d 699, 704 (7th Cir. 2016).

Between 2011 and 2024, Michael Thomas was incarcerated in Stateville Correctional Center ("Stateville"), an Illinois Department of Corrections ("IDOC") facility in Joliet, Illinois that has since closed.[1] (Am. Compl. [46] ¶ 12.) Throughout the later months of 2022, Thomas alleges, he complained to Warden Charles Truitt and Assistant Warden of Programs Kenneth Osborne (both named Defendants here) on multiple occasions about unsanitary living conditions in his housing unit, including "a severe roach infestation, the presence of rodents and other insects, and numerous birds flying around the cell block and the mess hall." (Id. ¶ 14.) Truitt and Osborne responded (presumably in oral conversations, though Thomas does not provide detail about these communications) that they would attempt to improve the living conditions, but that they would need time. (Id. ¶ 15.)

In November of 2022, Thomas began experiencing pain in his right ear and intense headaches. He sought medical care in several visits to Stateville's medical facilities. (Id. ¶ 17–22.) Thomas's symptoms persisted into December, and worsened significantly when, on December 20, 2022, Thomas was awoken by a burning pain in his right ear. (Id. ¶ 23–25.) Thomas also realized that he had difficulty hearing from that side. (Id. ¶ 23–25.) Thomas submitted a sick call request and was seen the same day by Defendant Charlotte Abelita, a nurse at Stateville, to address his worsening symptoms. (Id. ¶ 26; Abelita Mot. Summ. J. [95] ¶ 4.)

---

[1] Stateville was closed in late 2024 after Judge Andrea R. Wood of the Northern District of Illinois entered a preliminary injunction requiring IDOC to transfer all individuals in custody from Stateville to other IDOC facilities by September 30, 2024, due to severe infrastructural issues at Stateville. Dobbey v. Weilding, No. 13 C 1068 (N.D. Ill. Jan. 23, 2014), ECF No. 386. The State did not oppose the preliminary injunction, as it "determined that its resources would be better spent on building a new facility rather than attempting to repair Stateville's outdated facilities." Id. at 1.

Abelita conducted a medical assessment in which she inserted a tool into his right ear and began pulling something from his ear canal. (Am. Compl. [46] ¶¶ 26, 27.) Thomas turned and observed that Abelita had removed a cockroach from inside his ear.[2] (*Id.* ¶¶ 27–28.) Abelita assured Thomas that he would be called to the Health Care Unit for further examination and treatment by a doctor before the end of the day. (*Id.* ¶ 30.) But Thomas was not called back to the Health Care Unit until the following day, December 23, 2022, when he saw Nurse Practitioner Helen Bruckner, an employee of Wexford Health Sources (both named Defendants here). (*Id.* ¶ 9, 33–34.) According to Thomas's Amended Complaint [46], Bruckner performed a medical examination in which she inserted an instrument and liquid into his ear. (*Id.* ¶ 34–37.) She told Thomas that she would refer him for lab testing but refused his requests for medication that could ease his symptoms. (*Id.* ¶ 37–39.) Thomas's condition worsened, impacting both his physical and mental health. (*Id.* ¶ 41–47.) He was unable to sleep, and became "depressed and paranoid." (*Id.* ¶ 42–43.) Finally, on January 17, 2023, he was prescribed antibiotics for an ear infection by Doctor Evaristo Aguinaldo, whom he saw for treatment of an unrelated medical issue. (*Id.* ¶ 41–47;

---

[2] Disturbing as these circumstances are, they are, sadly, not unprecedented. *See e.g.*, *Fair v. Pfister*, No. 21 CV 00319, 2024 WL 2959316, at *2 (N.D. Ill. June 12, 2024) (Stateville prisoner "awoke to find a cockroach crawling in his left ear" and "lost all hearing" after medical staff did not prescribe antibiotics); *Curry v. Pfister*, No. 17 C 2052, 2019 WL 3801722, at *2, *4 (N.D. Ill. Aug. 12, 2019) (Stateville medical staff "flushed a cockroach from [plaintiff's] ear" after plaintiff filed grievances in 2014 and 2015 regarding "the cockroach problem at Stateville"); *Boyd v. Pfister*, No. 18-CV-03275, 2020 WL 6381367, at *1 (N.D. Ill. Oct. 30, 2020) (Stateville prisoner alleged "that his prison cell was so infested with cockroaches that one of them crawled into his ear, took up residence, and damaged his hearing"); *Massey v. Hardy*, No. 1:21-CV-00560, 2025 WL 964961, at *2 (N.D. Ill. Mar. 31, 2025) (plaintiff, who had no previous hearing issues, failed a hearing screening after "Stateville nurses examined his right ear and flushed out two dead cockroaches from his ear canal"); *Lewis v. Pfister*, No. 1:18-CV-4502, 2023 WL 121768, at *1 (N.D. Ill. Jan. 6, 2023); *Scott v. Pinas*, No. 14 C 6547, 2017 WL 3979101, at *2 (N.D. Ill. Sept. 11, 2017); *Postlewaite v. Obaisi*, No. 13 C 8756, 2015 WL 5950824, at *1 (N.D. Ill. Oct. 13, 2015); *Matthews v. Ill. Dep't of Corr.*, No. 16-CV-11214, 2024 WL 867087, at *9 (N.D. Ill. Feb. 29, 2024). These cases reflect only a sample of at least seventeen cases where Stateville prisoners alleged they had suffered from insects crawling into their ears.

Thomas Dep. [115-1] at 159:23–160:5.) The antibiotics cleared the infection, but Thomas still struggles with ear pain, hearing loss, and mental health issues arising from this injury. (Am. Compl. [46] ¶ 47–48.)

On December 24, 2022, Thomas filed an emergency grievance with the facility complaining of "unconstitutional living conditions" and complaining that he was not given adequate medical attention to address the pain in his right ear. (PSOF Ex. 2 [115-2] at 2–3[3]). Two weeks later, Warden Truitt determined that the grievance was not an emergency. (Am. Compl. [46] ¶ 40, Truitt and Osborne SOF ¶ 6.) Thomas's grievance counselor then received and reviewed this grievance on February 9, 2023, and responded 14 days later, on February 23, 2023. The response stated that "[e]very effort is made to ensure wildlife do not enter" the housing units, but that this could not be completely prevented as the animals enter from open doors and windows. The response also advised that Thomas could put in a request with security staff to have his cell "sprayed for bugs," and that if he was still feeling sick, he should "submit a sick call slip." (PSOF Ex. 2 [115-2] at 2–3.)

The next step in the grievance procedure requires that a prisoner who is dissatisfied with the response he has received must appeal the counselor's decision up the chain-of-response to the grievance officer. Whether Thomas took this next step is disputed. Thomas claims that he did so. (PSOF [115] ¶ 6; Thomas Dep. [115-1] at 104:11–104:16, 213:13–214:5.) But Defendants Abelita, Bruckner, and Wexford argue that Thomas did not, citing an apparent lack of documentary evidence presented by Thomas or in the prison's records. (Abelita Mot. Summ. J. [95] ¶ 8, 19; Abelita Reply [123] at 5; Wexford and Bruckner Mot. Summ. J. [104] at 6; Wexford and Bruckner Reply [125] at 2.) Defendants Truitt and Osborne more reservedly state that it is

---

[3] Rather than filing a separate Rule 56.1(b) Statement of Facts, Thomas attached his Statement of Facts to three separate responses to Defendants' Statement of Facts, filed under docket numbers 115, 117, and 120. For the purposes of this opinion, the court will refer to this Statement of Facts as "PSOF" and will reference docket number 115.

"unclear from the record when, if at all, Plaintiff sent his grievance to the grievance officer." (Truitt and Osborne Mot. Summ. J. [107] at 5.) All parties agree, however, that Thomas did not hear back from a grievance officer regarding his counselor's response.

It is also undisputed that on August 28, 2023, some six months after receiving that response, Thomas filed a second grievance regarding the same issues he outlined in his initial grievance. (PSOF Ex. 3 [120-3] at 3–4.) He asserted in that second grievance that eight months had passed and "clinical service have not responded nor returned my grievance." (*Id.* at 4.) Thomas requested that Stateville officials return his initial grievance to him with an explanation as to why they had yet to respond. In the event that his initial grievance had been lost, Thomas asked that his second grievance be processed as timely. (*Id.* at 3.) The grievance counselor reviewed Thomas's second grievance and deemed it untimely on September 4, 2023. (*Id.*) Thomas appealed to the grievance officer, but that officer reached the same conclusion. (*Id.* at 2.) Finally, on November 9, 2023, Thomas appealed to the Administrative Review Board ("ARB"), attaching a copy of his first grievance as well as his second. The ARB deemed both grievances untimely.[4] (*Id.* at 1; PSOF Ex. 2 [120-2] at 1.)

Thomas then filed suit in this court. His Amended Complaint [46] brings 42 U.S.C. § 1983 claims against Defendants for violations of his Eighth Amendment rights. Specifically, he alleges

---

[4] The parties dispute the basis for dismissal of Thomas's grievances. Thomas argues that his grievances were dismissed on the merits, as the grievance officer's denial of his August 2024 grievance noted that Thomas's concerns had been "previously addressed" by the counselor's response to his December 2023 grievance. (Opp'n [112] at 14–15.) This merits-based dismissal, Thomas contends, renders his administrative remedies exhausted. (*Id.*) Defendants challenge Thomas's characterization. (*See e.g.*, Abelita Reply [123] at 2–4.) The court need not resolve this dispute, as summary judgment is denied on other grounds. Still, the court notes that in addition to Thomas's complaints about his ear, he raised more general concerns about the conditions at Stateville, and it appears that Thomas exhausted his remedies as to that claim by way of his second grievance. Because he has not so argued, however, and because the court is denying summary judgment on other grounds, this point does not warrant further discussion.

that Defendants Truitt and Osborne were deliberately indifferent to unlawful conditions of confinement (Count I); that Defendants Abelita and Bruckner were deliberately indifferent to his serious medical condition (Count II);[5] and that Defendant Wexford's deficient policies and procedures regarding timely provision of medical care render it liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (Count III).  Defendants have moved for summary judgment [94, 102, 105] on all counts on the basis that Thomas failed to exhaust administrative remedies before filing suit, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a).

## DISCUSSION

**I.      Standard of Review**

Failure to exhaust is an affirmative defense that a defendant "has the burden of proving." *Westefer v. Snyder*, 422 F.3d 570, 577 (7th Cir. 2005).  In moving for summary judgment on this issue, Defendants must show "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If Defendants meet this burden, Thomas must then "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  In deciding whether to grant summary judgment, the court "may not weigh conflicting evidence or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up)**;** *see also Jones v. Lamb,* 124 F.4th 463, 467 (7th Cir. 2024) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

---

[5] In Count II, Thomas also alleged that Wexford exhibited deliberate indifference to his serious medical condition through their promulgated policies and procedures. (Am. Compl. [46] ¶¶ 69–78.)  Thomas and Wexford stipulated to dismiss Count II as to Wexford on the grounds that Thomas's allegations in Count II against Wexford were superfluous to his *Monell* claim (Count III).  (Joint Status Report [76] ¶ 3–4.)

6

(citation and internal quotation marks omitted)). Rather, the court views "the record in the light most favorable to the [nonmoving party] and draw[s] all reasonable inferences from the evidence in that party's favor." *Vaughn v. Walthall*, 968 F.3d 814, 818 (7th Cir. 2020). The court should grant summary judgment only if, after assessing the record under these parameters, it finds that there is no genuine factual dispute that would change the legal outcome of the case.

## II. Analysis

The PLRA imposes the requirement that, before filing suit regarding prison conditions, a prisoner must exhaust all administrative remedies available to him. 42 U.S.C. § 1997e(a); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) (holding that to properly exhaust, "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). Importantly, the statute contains a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Ross v. Blake*, 578 U.S. 632, 635–36 (2016). When "prison employees do not respond to a properly filed grievance," they render that remedy "unavailable" for the purposes of analyzing exhaustion. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016) (quoting *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)).

IDOC's grievance procedures are set forth in 20. ILL. ADMIN CODE § 504.800, and in Administrative Directive 04.01.114. (Truitt and Osborne Reply Ex. 1 [127-1].) The procedures include three steps that a prisoner must take in order to fully exhaust his administrative remedies. First, the prisoner must submit a grievance to a grievance counselor within 60 days of the events at issue. 20 ILL. ADMIN. CODE § 504.810(a). Second, if he is unsatisfied by the counselor's response, he must forward his initial grievance to the grievance officer, though both the Administrative Code and Directive are silent regarding the time frame for this step. (Truitt and Osborne Reply Ex. 1 [127-1] at 4.) Within two months of receiving an appeal of a grievance counselor's response, the grievance officer reviews the counselor's reply, makes his own determination, and forwards the grievance and the officer's response to the chief administrative

officer. 20 ILL. ADMIN. CODE § 504.830(e). The chief administrative officer reviews the grievance officer's determination, and either ratifies or remands, also within two months of his receipt.[6] (Truitt and Osborne Reply Ex. 1 [127-1] at 5–6.) The chief administrative officer then sends the grievance back to the prisoner. (*Id*.) Third, if the prisoner remains unsatisfied with the response, he has thirty days to appeal the grievance to the ARB. (*Id.*)

Defendants argue that summary judgment is warranted because Thomas failed to exhaust his administrative remedies. Specifically, Defendants Abelita, Wexford, and Bruckner contend that Thomas failed to properly appeal the counselor's response to his first grievance. (*See* Abelita Mot. Summ. J. [95] ¶ 8; Wexford and Bruckner Mot. Summ. J. [104] at 1–2.) In the alternative, all Defendants argue that regardless of whether Thomas did or did not properly appeal the counselor's response, the six-month delay between Thomas's receipt of the grievance counselor's response and the filing of his second grievance shows that Thomas was "sitting on his hands," which, they contend, amounts to non-exhaustion. (Wexford and Bruckner Reply [125] at 3; Truitt and Osborne Mot. Summ. J. [107] at 6; Abelita Reply [123] at 7.) The court addresses each of these arguments in turn.

A.  **Failure to Appeal**

Thomas insists, both in his pleadings and during his deposition, that he did in fact appeal the counselor's February 23, 2023, response. (Opp'n [112] at 4–6[7]; PSOF [115] ¶ 6; Thomas Dep. [115-1] at 104:11–104:16 ("I got the first phase back. But when we appeal to the grievance office, that part didn't come back."), 213:13–214:5. (Q: "So when you received your response from

---

[6] Administrative Directive 04.01.114 states that "The Chief Administrative Officer shall make reasonable efforts [to complete his review] within two months of the receipt of the grievance," however, it is unclear whether this means two months after the receipt of the grievance from the prisoner or from the grievance officer. (Truitt and Osborne Reply Ex. 1 [127-1] at 5.)

[7] Thomas filed three nearly identical Opposition Briefs in response to Defendants' Motions for Summary judgment. [112, 114, 116]. For the purposes of this opinion, the court will refer to the document filed under docket number 112.

the counselor, you submitted it to the administrative review board?" A: "I went to the grievance office again, sir. Once I went to the grievance office, you don't get your response back, then you go to Springfield with it.").) But Abelita, Wexford, and Bruckner do not believe him, and they urge the court to reject this claim as well, citing an apparent lack of documentary evidence either presented by Thomas or in the prison's record keeping systems. (Abelita Mot. Summ. J. [95] ¶ 19; Wexford and Bruckner Mot. Summ. J. [104] at 6–7.) Thomas does not have a copy of the materials he claims to have submitted, but he testified that he did so, and at least some other evidence supports his position: Thomas's second grievance inquiring why he had not heard back from the grievance officer provides some indication that he did, in fact, appeal the counselor's response. Defendants Wexford and Bruckner characterize Thomas's second grievance as an attempt to "paper over his own neglect." (Wexford and Bruckner Mot. Summ. J. [104] at 6.) A jury might agree with this characterization, but Defendants' contention is inappropriate at the summary judgment stage, where the court must view the facts in the light most favorable to Thomas. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) ("[N]o matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party.") The court views this second grievance just as it appears: an attempt by Mr. Thomas to get answers as to why his first grievance—after he properly appealed it to the grievance officer—simply disappeared.

This second grievance, taken together with Mr. Thomas's pleadings and his statements under oath during his deposition, present sufficient "evidence on which the jury could reasonably find for [Thomas]." *Anderson*, 477 U.S. at 247–48, 252 (outlining that a genuine dispute of material fact can be supported by documents in the record including pleadings and depositions). This quintessential genuine dispute of material fact is one that a jury, not the court, must resolve. *See Deets v. Massman Const. Co.*, 811 F.3d 978, 982 (7th Cir. 2016) (reversing the district court's

grant of summary judgment because a factual dispute existed regarding whether defendant ever made the discriminatory statement at issue).

### B. Failure to Follow Up

Defendants argue, in the alternative, that even if Thomas did seek review of his first grievance, he failed to exhaust his remedies by doing nothing to follow up in the six months from the time that he allegedly appealed his first grievance to August 28, 2023, when he filed his second grievance. A requirement that a prisoner follow up in response to silence might have merit, but no such requirement appears in the grievance processes outlined by the institution. *See generally* 20 ILL. ADMIN. CODE § 504.810. To successfully exhaust administrative remedies, "[a] prisoner must comply with the specific procedures and deadlines established by the prison's policy," *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015), *overruled on other grounds, Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020), but he need not go beyond them. *William v. Wexford*, 957 F.3d 828, 834 (7th Cir. 2020) (finding that, though a prisoner "must take all the steps the prison offers" in order to properly exhaust, he need not "go beyond the established system and guess at some other way of attracting the attention of the prison authorities"); *see also Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016) ("The PLRA does not . . . demand the impossible.").

Still, to engage Defendants' point, it is worthwhile to lay out a timeline. After appealing his decision to the grievance officer sometime in late February,[8] all Thomas needed to do was wait for a response. The Administrative Code and Administrative Directive outlining the grievance process are ambiguous as to whether the grievance office had two months or four months to respond to Thomas's appeal. *See* 20 ILL. ADMIN. CODE § 504.830; (Truitt and Osborne Reply Ex. 1 [127-1] at 5–6); *supra* at 8 n.6. Moreover, not even this deadline appears to be a firm one; the

---

[8] The Administrative Code and Administrative Directive are unclear regarding how long Thomas had to appeal the counselor's decision to the grievance officer, *see* 20 ILL. ADMIN. CODE § 504.830; (Truitt and Osborne Reply Ex. 1 [127-1] at 3–5), but the court will assume that if Thomas did appeal the counselor's decision, he did so soon after receiving it.

officer is expected to provide his findings and recommendations to the Chief Administrative Officer within two months "when reasonably feasible under the circumstances," 20 Ill. Admin. Code § 504.830, and the Chief Administrative Officer need only "make reasonable efforts [to complete his review] within two months of the receipt of the grievance."  (Truitt and Osborne Reply Ex. 1 [127-1] at 5.)  Reading this ambiguity in the light most favorable to Thomas, it was reasonable for Thomas to wait to hear back for several months.[9]  And shortly thereafter, when he failed to hear back, Thomas attempted to follow up via a second grievance filed in late August.  Therefore, for the bulk of the six-month gap that Defendants point to, the ball was in the prison's court.

Defendants cite to several unpublished cases to support their contention that a prisoner who simply "sits on his hands" has failed to exhaust, see e.g., Salley v. Parker, No. 18-CV-5700, 2020 WL 4736412, at *9 (N.D. Ill. Aug. 14, 2020); Hill v. Bond, No. 13 CV 7305, 2015 WL 1166053, at *3 (N.D. Ill. March 11, 2015); Goldsmith v. Zolecki, No. 12 C 3965, 2013 WL 5699302, at *5 (N.D. Ill. Oct. 18, 2013), but those cases are easily distinguishable.  In Salley, Hill, and Goldsmith, plaintiffs failed to pursue their grievances after they did not hear back, instead proceeding to file a lawsuit without taking any further steps.  Thomas, in contrast, did attempt to follow up: he filed a new grievance after not hearing back and exhausted the grievance process with regard to that grievance.  Cf. Salley, 2020 WL 4736412, at *9 (suggesting that "fil[ing] a new grievance" would have been adequate to demonstrate that the prisoner followed up on his grievance).  Thomas's actions are thus more analogous to the actions of the plaintiff in Dole v. Chandler, 438 F.3d 804, 807 (7th Cir. 2006), who, after failing to hear back from the ARB, inquired into the status of a grievance he had appealed.  The ARB responded to his inquiry and told him they had no record of his appeal, and Dole then filed suit without re-filing his grievance.  Id. at 807–08.  The Seventh

---

[9] Defendants' concern about potential fraud by prisoners who fail to adhere to the grievance process is valid, though the prison could allay such concerns by implementing clearer deadlines in the process and issuing notices to prisoners when their period for appeal of a grievance has expired.  A prisoner who claims to have appealed but fails to follow up immediately after receiving such a notice would have greater difficulty establishing exhaustion.

Circuit held that Dole had exhausted his remedies by following up with the ARB. *Id.* at 812 ("By properly mailing his ARB complaint, alerting the ARB that the complaint was mailed, and filing suit only after the ARB failed to clarify what he should do next, Dole had done all that was reasonable to exhaust his administrative remedies."). Because the record, construed in the light most favorable to Thomas, demonstrates that Thomas followed up on his first grievance after not hearing back, the court must deny summary judgment on the issue of exhaustion.

### C. Hearing

Defendants Wexford and Bruckner argue that, if the court concludes there are questions of material fact that preclude summary judgment, the court should hold an evidentiary hearing to test the credibility of Thomas's evidence that he adequately exhausted his administrative remedies. (Wexford and Bruckner Mot. Summ. J. [104] at 7 (citing *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), *abrogated by Perttu v. Richards*, 605 U.S. 460 (2025)).) Thomas agrees with this proposition. (Opp'n [112] at 6.) In *Perttu*, however, the Supreme Court made clear that "parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment." In light of that holding, the court declines to conduct a *Pavey* hearing. 605 U.S. at 468. The question of when the issue of exhaustion is "intertwined" with the merits of a claim remains uncertain under Seventh Circuit jurisprudence. *See Breyley v. Fuchs*, 156 F.4th 845, 849 (7th Cir. 2025) (declining to resolve the issue of whether the issue of exhaustion was intertwined with the merits of a prisoner's claim, but remanding to the district court with instructions to make such a determination). At this phase, the court interprets this uncertainty generously in favor of Thomas: because the substantive § 1983 claim that Thomas brings is intertwined with his evidence of exhaustion (in that a fact finder would need to assess the credibility of the same witnesses on both questions), Thomas's claim will proceed to a jury trial on all issues, including exhaustion. *See Murphy v. Bailey*, 794 F. Supp. 3d 556, 575 (C.D. Ill. 2025) (holding that "it is sufficient for exhaustion and merits issues to be intertwined when a fact-finder must make" common credibility determinations on both issues).

## **CONCLUSION**

Defendants' motions [94, 102, 105] for summary judgment are denied. A status conference remains set for February 23, 2026, and the court will set a trial date at that time.

ENTER:

Date: February 3, 2026

_____
REBECCA R. PALLMEYER
United States District Judge